# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD LOUIS STARKS and : Civil No. 1:24-CV-00739
CHRISTIAN STARKS, :
 :
      Plaintiffs, :
 :
      v. :
 :
NORTHERN YORK COUNTY :
REGIONAL POLICE DEPARTMENT, :
*et al.*, :
 :
      Defendants. : Judge Jennifer P. Wilson

## <u>MEMORANDUM</u>

The events giving rise to the instant case began with a neighborhood property dispute and ended with a failed prosecution for attempted murder. The former criminal defendant, Richard Louis Starks ("Starks"), along with his son, Christian Starks ("Christian"), now bring an array of § 1983 and state-law claims against several police officers, a police department, and a township. These claims include malicious prosecution and false arrest in violation of the Fourth Amendment and Pennsylvania law, selective enforcement in violation of the Fourteenth Amendment, a variety of other constitutional claims, conspiracy, intentional infliction of emotional distress, and negligent infliction of emotional distress. Currently before the court is a motion to dismiss filed by the police officers, the police department, and the township. For the reasons that follow, the court will grant in part and deny in part Defendants' motion.

**BACKGROUND**

**A. Property Dispute and Subsequent Altercation**

Starks owned Paws Pet Resort ("Paws") located at 6876 Cannery Road in Heidelberg Township, Pennsylvania. (Doc. 25, ¶ 11.) Christian, who managed Paws, was present at the pet resort on the morning of May 2, 2022. (*Id.* ¶¶ 12, 26.) That morning, William Kenneth Knight ("Knight") allegedly entered the Paws property and began threatening to "blow the place up" and poison the dogs located there. (*Id.* ¶¶ 46, 49.) When making these threats, Knight allegedly possessed a black object that Plaintiffs allege was a firearm. (*Id.* ¶¶ 49, 52.) Knight's alleged outburst was triggered by a property dispute he had with Starks. (*See id.* ¶ 62.) Knight's family farm is located at 6900 Cannery Road. (*Id.* ¶ 66.)

After Knight left, Christian called his father—who was not at Paws—to report the incident to him. (*See id.* ¶ 51.) Upon receiving Christian's call, Starks called 911. (*Id.*) No one responded to Starks's first 911 call, which was allegedly "not of record." (*Id.* ¶ 59.) Knight then allegedly returned to Paws with his father, Marvin Knight. (*Id.* ¶ 58.) Christian reported Knight's return to Starks, who called 911 twice more. (*Id.* ¶¶ 56–57, 60.) Starks then traveled to Paws and, upon his arrival, allegedly saw Knight on an adjacent property. (*See id.* ¶ 61.) At this point, Starks "believed that . . . Knight was returning to Paws for a third time to make good on his threats." (*Id.*) Allegedly in fear for his and Christian's lives,

2

Starks obtained guns from his gun safe on the property. (*Id.* ¶ 64.) Guns in tow, Starks drove after Knight's vehicle in order to obtain a license plate number for the 911 operator with whom he was on the phone. (*Id.* ¶ 66.) Starks followed Knight to an "access roadway" located on Knight's family farm off Cannery Road ("Farm Lane"). (*Id.* ¶¶ 67, 71.) On the Farm Lane, Starks advised the 911 operator of Knight's license plate number as Knight's vehicle drove past him towards Cannery Road. (*Id.* ¶ 69.) Starks then followed Knight towards Cannery Road. (*Id.* ¶ 70.) Knight's vehicle eventually stopped, and Starks drove past him on the left. (*Id.* ¶ 71.) As Starks passed, Knight allegedly kicked the passenger side of Starks's vehicle. (*Id.* ¶ 71.) Starks then stopped his car to inspect his vehicle for damage. (*Id.* ¶¶ 72–73.)

At this point, Knight allegedly accelerated his vehicle towards Starks's, making violent contact. (*Id.* ¶ 75.) Starks reentered his vehicle in the hopes of escaping the scene, but his vehicle was allegedly disabled by the impact. (*Id.* ¶ 77.) At the same time, Knight allegedly drove his vehicle towards Cannery Road, turned around, and then again accelerated towards Starks. (*Id.* ¶¶ 79–80, 83.) Knight allegedly then caused a second violent collision while Starks was in his vehicle. (*Id.* ¶ 84.) Following this second impact, Knight allegedly reversed his car and again accelerated towards Starks's vehicle. (*Id.* ¶ 86.) This time,

Starks fired several rounds of his rifle towards Knight's vehicle in an attempt to stop the alleged attack.  (*Id.* ¶ 87.)  Shortly thereafter, police arrived on scene.

### B. Police Investigation

Defendants Lieutenant John Migatulski ("Migatulski"), Sargent Jack Asper ("Asper"), and Officer Steven Lebo ("Lebo") of the Northern York County Regional Police Department ("NYCRPD") arrived at the scene and investigated the incident.  (*Id.* ¶¶ 98, 100, 107.)  Christian also arrived at the scene after the incident.  At the scene, Asper allegedly used insensitive language when referring to Starks—who is a "mixed-raced individual, born of a Hispanic and African-American Father and a Caucasian mother"—and to Christian—who "has dark skin and has physical features of an Asian-American individual."  (*Id.* ¶¶ 11–12, 101.)  Specifically, Asper allegedly referred to Starks as "foreign" and "fat guy," and called Christian the "Chinese guy, Korean guy, or whatever."  (*Id.* ¶ 101.)  Asper also intimated to other officers that Starks and Christian were "likely drug dealers" and that Starks was a drug user.  (*Id.* ¶ 103.)

Over the next couple of weeks, the officers investigated the incident.  This investigation culminated in Lebo authoring a criminal complaint and affidavit of probable cause dated June 8, 2022 ("Lebo Affidavit").  (Doc. 34-1.)  The Lebo Affidavit contains Starks's account of the incident, which mostly mirrors his

pleadings.  (*See id.* at 2–3.) [1]  The Lebo Affidavit also contains several other notable pieces of information.

### 1.  Knight's Version of Events

The Lebo Affidavit contains Knight's account of the incident, which police collected during an interview two days later.  (*Id.* at 4–5.)  According to Knight, he went to Paws to take pictures of land he claimed was on his family's farm but that Starks was disturbing.  (*Id.* at 4.)  Knight stated that he was concerned this disturbed land would wash away due to the rain occurring on the day of the incident.  (*Id.*)  Knight claimed that Christian had yelled at him for taking the pictures.  (*Id.*)  After an ensuing argument, Knight gave "Christian the middle finger" before leaving the property.  (*Id.* at 5.)  Knight denied threatening or intending to hurt the dogs.  (*Id.*)  He also denied having a firearm while at Paws; he insisted that the black object he had possessed was a camera case.  (*Id.*)  Knight claimed his father had asked him to return to Paws to see whether the rain was washing away the disputed land.  (*See id.*)  This time, Knight's father accompanied Knight.  (*Id.*)  Upon arriving at Paws, the pair quickly saw disturbed land, and Knight's father suggested that they return to the farm to call a lawyer.  (*Id.*)  Knight claimed that he took his father back to the farm at that point.  (*Id.*)

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

As he left the farm, Knight told police that he saw Starks's vehicle on the Farm Lane between himself and Cannery Road. (*Id.*) Knight claimed that Starks was outside his vehicle in the jamb of his car door with his rifle pointing at Knight. (*Id.*) Knight claimed that Starks had commanded Knight to step out of his car and had threatened to shoot and kill him. (*Id.*) At this point, Knight claimed, he drove next to Starks's vehicle and said to Starks, "[i]f you're going to shoot me, just fucking shoot me now." (*Id.*) Knight claimed that after this encounter, he had started to drive towards Cannery Road when Starks began firing several rounds towards his car. (*Id.*) Reportedly afraid for the safety of his parents back at the farm, Knight turned his vehicle around to face Starks. (*Id.*) Knight told police that Starks had fired another shot at him as he drove back towards Starks; Knight claimed this shot had gone through his windshield and had caused him to bleed from his head. (*Id.*) Knight told police that he had responded by accelerating as fast as possible towards Starks's vehicle. (*Id.*) After making contact with Starks's vehicle, according to Knight, Starks fired several more rounds. (*Id.*) Knight denied causing more than one collision with Starks's vehicle. (*Id.*) Knight told police that the collision had disabled his vehicle. (*Id.*) Knight stated that he had crawled out of his car onto a grassy field, where Starks allegedly began beating him with a butt of his rifle before police arrived on scene. (*Id.*)

**2. Statements and Evidence Collected from Eyewitness Tammy Diehl**

The Lebo Affidavit also contains statements from eyewitness Tammy Diehl ("Diehl"), who lives within sight of Paws and the Farm Lane. (*Id.* at 1, 4.) Diehl called 911 to report the incident. (*Id.* at 1.) She reported to 911 that a motor vehicle crash had occurred followed by gunshots. (*Id.*) Police interviewed Diehl the following day. (*Id.* at 4.) Diehl told police that her attention had been first pulled outside after she had heard Knight's vehicle accelerating towards the farm. (*Id.*) She reported that she then saw Starks's vehicle heading towards the farm. (*Id.*) She stated that she began taking photographs on her phone when she saw the two vehicles staring each other down. (*Id.*) Diehl claimed that she had seen Knight's vehicle drive around Starks's car towards Cannery Road. (*Id.*) She then claimed that she had witnessed Knight's vehicle turn around, accelerate towards Starks's vehicle, and strike it twice before she heard rapid gunshots. (*Id.*) It was not until after the gunfire that Diehl began recording videos on her phone. (*Id.*)

With Diehl's permission, police extracted the photographic evidence from her phone as well as video from the security cameras on Diehl's property. (*Id.*) Police reviewed this evidence on May 13. (*Id.* at 6.) Police determined that the pre-shooting photographic evidence "supported . . . Knight's statement about the events leading up to the shooting and directly contradict[ed] . . . Starks's statement" to police. (*Id.*)

Diehl's photographic evidence also "supported . . . Knight's statements" about the incident itself "and contradicted . . . Starks's statements." (*Id.* at 7.) Notably, Diehl took a photograph of Starks "standing on the" Farm Lane and "appear[ing] to be pointing a rifle towards Knight's vehicle" as it drives away towards Cannery Road. (*Id.*) Starks was on his 911 call at the moment this picture was taken. (*Id.* at 8.) The audio of that call established, according to police, that when Diehl took the picture, Starks was "charging his rifle" and then quickly fired two gunshots. (*Id.*) Law enforcement concluded, based upon this evidence, that Starks fired his weapon before any collision occurred between Knight's vehicle and Starks's, and then again following Knight's collision with Starks's vehicle. (*Id.*) Police determined that this evidence along with other evidence detailed in the Lebo Affidavit warranted criminal charges against Starks. (*Id.*)

### C. Starks's Prosecution for Attempted Murder

Police charged Starks with "criminal attempt homicide, aggravated assault, simple assault, terroristic threats, and recklessly endangering another person." (*Id.*) A preliminary hearing before a magisterial district judge was held on June 29, 2022. (Doc. 25, ¶ 122.) At that hearing, Lebo testified that he found Knight's statements credible. (*Id.*) Starks's case having met the preliminary-hearing standard, it proceeded towards trial. (*See id.* ¶ 160.). The trial, originally scheduled for October 2023, was ultimately continued to April 2024. (*Id.*)

Plaintiffs allege that prior to the October 2023 trial date, prosecutors learned that Diehl was going to testify that she had heard the gunshots before the vehicle collision, contradicting her previous statement to police.  (*See, e.g.*, *id.* ¶¶ 161–63.)  At trial, Diehl ultimately testified that she heard gunshots before a vehicle collision.  (*See id.* ¶ 175.)  Starks characterized this known change in testimony as "impeachment material" and, thus, argued to the trial court that the prosecutors' failure to disclose it was a violation of Starks's due process rights.  (*Id.* ¶¶ 175, 178.)  Plaintiffs claim, and Defendants agree, that this alleged due process violation is what led the prosecutors to withdraw with prejudice the charges against Starks on April 3, 2024.  (*Id.* ¶¶ 179–80; Doc. 35, p. 14.)

### D. Procedural History

On May 1, 2024, Starks and Christian filed suit in this court against Lebo, Asper, Migatulski, NYCRPD, and Heidelberg Township ("Heidelberg").[2]  (Doc. 1.)  Defendants then filed a motion to dismiss.  (Doc. 17.)  In response, Starks and Christian filed an amended complaint.  (Doc. 25.)  Defendants have now renewed their motion to dismiss with nearly identical arguments for dismissal.  (Doc. 34.)  The court has reviewed Defendants' brief in support, the Lebo Affidavit, and their reply brief, as well as Plaintiffs' brief in opposition.  (Docs. 34-1, 35, 41, 47.)

---

[2] Knight and his father, Marvin Knight, are also defendants in this case.  There is currently a pending motion to substitute the Administrator of the Estate of Marvin Knight as a party.  (Doc. 68.)  These defendants are not implicated by the instant motion.

Plaintiffs supplemented their opposition with a motion asking the court to "exclude" the Lebo Affidavit from the Defendants' motion or, in the alternative, to convert Defendants' motion to dismiss to a motion for summary judgment. (Doc. 38.) The court has reviewed Plaintiffs' brief in support as well as Defendants' brief in opposition. (Docs. 39 & 49.) The parties' disputes are now ripe for review.

## JURISDICTION

Plaintiffs bring claims arising under the Constitution of the United States as well as claims arising under the laws of Pennsylvania. The court has subject matter jurisdiction over Plaintiffs' constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367. Venue properly lies in this court pursuant to 28 U.S.C. 1391(b).

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead

to state a claim for relief," disregards the allegations "that are no more than

conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to

relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other*

*grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

## DISCUSSION

### A. Plaintiffs' Motion to Exclude

The court must first determine whether it may consider the Lebo Affidavit—

which Defendants attached to their motion to dismiss—in resolving the instant

motion to dismiss.  Plaintiffs insist that the court may not.  They are wrong.

Generally, courts may not venture outside the pleadings to resolve a motion

to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Fed. R.

Civ. P. 12(d).  As Rule 12(d) states:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the
> pleadings are presented to and not excluded by the court, the motion
> must be treated as one for summary judgment under Rule 56.  All
> parties must be given a reasonable opportunity to present all the
> material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  Notwithstanding Rule 12(d)'s language, the Third Circuit has "held that a court may consider narrowly defined types of material without converting the motion to dismiss." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999).  One such exception is carved out for a "document *integral to or explicitly relied upon* in the complaint." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).  Another exception is for an "undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  These types of documents do not implicate the "primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff." *Burlington*, 114 F.3d at 1426.  Rather, such problem "is dissipated '[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *Id.* (quoting *Waterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993)).

While Plaintiffs concede that the amended complaint refers to the Lebo Affidavit "in isolation," they insist that the document is not integral to their claims. (Doc. 39, p. 10.).  Instead, Plaintiffs argue, "it is the cumulative effect of countless documents, video, and photographs that form the basis of the Complaint."  (*Id.*) Plaintiffs are correct that the exceptions to Rule 12(d) are not applicable when a

complaint merely cites a document. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

But here, it is clear that Plaintiffs do more than simply cite the Lebo Affidavit. Their malicious-prosecution and false-arrest claims heavily rely on allegations that the police officer Defendants knowingly included falsehoods in the Lebo Affidavit and/or withheld information from it to justify Starks's prosecution. (*See* Doc. 25, ¶¶ 31, 109, 123, 152, 295, 296.) These allegations are essential to Starks's malicious-prosecution and false-arrest claims. Indeed, as a general matter, affidavits of probable cause are so inherently significant to claims for malicious prosecution and false arrest that courts routinely consider them at the motion to dismiss stage. *See Shelley v. Wilson*, 339 F. App'x 136, 137 n.2 (3d Cir. 2009) (affirming district court's consideration of a "criminal complaint and affidavit of probable cause for an arrest warrant"); *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 422–23 (M.D. Pa. 2017) (relying on "criminal complaint and affidavit of probable cause" in resolving motion to dismiss and citing several cases that do the same).[3]

---

[3] Plaintiffs contend that *Shelley* is distinguishable, because the plaintiff in that case was convicted on some charges. (Doc. 39, p. 8.) This is significant, according to Plaintiffs, because "[a]uthentcity and reliability of documents is [sic] bolstered where a conviction occurs." (*Id.*) This argument is wholly unpersuasive. As to authenticity, nowhere else do Plaintiffs argue that the Lebo Affidavit is not the authentic document used to bring charges against Starks. As to reliability, Plaintiffs misunderstand the process by which the court would review the Lebo Affidavit. As explained below, the court must reconstruct the affidavit based upon Plaintiffs' well-pleaded allegations. This process does not involve weighing the reliability of the Lebo Affidavit against the reliability of Plaintiffs' allegations.

For these reasons, the court will deny Plaintiffs' motion to exclude and consider the Lebo Affidavit in resolving Defendants' motion to dismiss.

## B. Constitutional Claims

Plaintiffs' amended complaint presents the court with a panoply of constitutional claims against Defendants. Plaintiffs organize their § 1983 counts by defendant, rather than by cause of action. So, Plaintiffs' pleading of their constitutional claims generally include a single count for each Defendant titled "Deprivation of Rights in Violation of Federal Law." Into these counts, Plaintiffs pack a variety of references to constitutional violations and often fail to state with clarity what their § 1983 claims are, leaving the court to fill in the gaps. The court parses through the claims in turn.

### 1. Fourth Amendment Claims

Starks claims that Lebo and Asper violated his "4th Amendment rights including to be free from searches and seizures." (Doc. 25, ¶¶ 186, 193). These alleged violations also appear to be a basis for Plaintiffs' *Monell* claims. (*See* Doc. 25, ¶¶ 207–36, 242–46.) Defendants interpret Starks's Fourth Amendment claims to be ones for malicious prosecution and false arrest. (*See* Doc. 35, pp. 18–30.) Starks's brief in opposition does nothing to refute this interpretation. Accordingly, the court proceeds on the understanding that Starks asserts Fourth Amendment claims for malicious prosecution and false arrest.

The Fourth Amendment to the United States Constitution, incorporated as to the states by the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  One such "type of unreasonable seizure" is "an arrest and detention of a person based on a criminal charge lacking probable cause."  *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024).  Such a violation can give rise to two types of § 1983 claims: malicious prosecution and false arrest.  *Id.*; *see James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (explaining that one states a Fourth Amendment false arrest claim when one establishes that an arrest was made without probable cause).

To state a claim for false arrest under the Fourth Amendment, Starks must allege: "(1) that there was an arrest; and (2) that the arrest was made without probable cause."  *James*, 700 F.3d at 680.  Similarly, a Fourth Amendment malicious prosecution claim requires Starks to allege:

(1) the defendants initiated a criminal proceeding;

(2) the criminal proceeding ended in the plaintiff's favor;

(3) the proceeding was initiated without probable cause;

(4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (quoting

*Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).  Fatal to both

claims is the existence of probable cause.  *Wheeler v. Wheeler*, 639 F. App'x 147,

150 n.8 (3d Cir. 2016)

Here, Lebo and Asper argue that they had probable cause to charge Starks

and, therefore, are entitled to qualified immunity since no constitutional violation

occurred.  (Doc. 35, pp. 18–19.)  To resolve this claim of qualified immunity, the

court must (1) decide if the facts alleged "make out a violation of a constitutional

right" and (2) if so, determine if the "right at issue was 'clearly established' at the

time of the defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223,

232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  If Starks failed to

adequately allege that Asper and Lebo lacked probable cause, then qualified

immunity will shield them from these Fourth Amendment claims.

Probable cause "is a practical, nontechnical conception" that "is incapable of

precise definition or quantification into percentages."  *Maryland v. Pringle*, 540

U.S. 366, 371 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).  This is

because it is a "fluid concept—turning on the assessment of probabilities in

particular factual contexts—not readily, or even usefully, reduced to a neat set of

legal rules."  *Id.* (quoting *Gates*, 462 U.S. at 232).  Nevertheless, the core

"substance of all the definitions of probable cause is a reasonable belief of guilt."

*Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *accord Probable Cause*, Black's Law Dictionary (12th ed. 2024) (defining "probable cause" as "[a] reasonable ground to suspect that a person has committed or is committing a crime"). As the Third Circuit has stated, "[p]robable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution [to believe] that an offense has been committed by the person being arrested." *United States v. Meyers*, 308 F.3d 251, 255 (3d Cir. 2002); *accord Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) ("Probable case exists if there is a 'fair probability' that the person committed the crime at issue.").

Here, Starks claims that the Lebo Affidavit did not establish probable cause due to material falsehoods and omissions. Such an argument must be supported by well pleaded allegations that establish: "(1) that [Lebo and Asper] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Shaffer v. City of Pittsburgh*, 650 F. App'x 111, 113–14 (3d Cir. 2016) (quoting *Wilson*, 212 F.3d at 786–87).

In analyzing these two factors, the court must perform "the reconstructive surgery required by [Third Circuit] jurisprudence." *Wilson*, 212 F.3d at 789. This

17

procedure has two steps.  First, the court "must identify any improperly asserted or omitted facts" made with the requisite intent.  *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016).  Second, the court must "excise the offending inaccuracies" from the Lebo Affidavit, "insert the facts recklessly omitted," and then "assess whether the reconstructed affidavit would establish probable cause."  *Dempsey*, 834 F.3d at 470 (quoting *Wilson*, 212 F.3d at 789).

### i. Allegedly Improper Omissions and False Statements

The court first considers the Defendants' alleged omissions.  One of the central themes of Starks's amended complaint is that Defendants failed to perform an adequate investigation and, therefore, failed to include relevant exculpatory information in the Lebo Affidavit.[4]  In their opposition brief, Plaintiffs summarize a laundry list of actions that they claim Lebo failed to do, which led to material omissions from the Lebo Affidavit, including:

> (1) Lebo modified the time on Diehl's surveillance footage at his own discretion; (2) Lebo failed to do anything to amplify the sound and voices of the 911 [calls] to confirm his suspicions; (3) Lebo failed to follow up and complete a crash scene investigation; (4) Lebo failed to analyze bullets; (5) Lebo failed to mention the weapon of [Knight] and/or allowed it to disappear; (6) Lebo never reviewed the alleged

---

[4] Paragraph 152 of the amended complaint is an illustrative example of Plaintiffs' theory.  That paragraph reads, "Officer Lebo and the NYCRPD knew that if they did complete the investigation of the Incident, necessarily including the accident reconstruction, bullet analysis, trajectory analysis, and physical inspection, that the story of Ken Knight would be completely contradicted and unusable; therefore, NYCRPD did not complete the investigation, and consciously withheld the information from the prosecution in order to have Mr. Starks arrested and prosecuted for attempted murder."  (Doc. 25, ¶ 152.)

camera of [Knight]; and among other things (7) Lebo failed to verify the authenticity and reliability of the evidence.

(Doc. 41, pp. 7–8.) (footnotes omitted). The court will not consider item 1, because that allegation is not pleaded in the complaint. *See Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") The other items amount to complaints that the police did not perform an exhaustive investigation that, if done, allegedly would have exonerated Starks. Yet, Starks's emphasis on the inadequacy of law enforcement's investigation misses the mark for three reasons.

First, the Defendants could not have intentionally or recklessly withheld information if they never knew the information in the first place. *See Wilson*, 212 F.3d at 788 (explaining that omissions can only be made with reckless disregard for the truth if the withheld fact is within the officer's ken); *United States v. Larnerd*, 514 F. Supp. 3d 660, 673 (M.D. Pa. 2021) ("[T]he court cannot hold that an officer omitted a fact in reckless disregard for the truth when he did not know the fact. . . .").

Second, the law simply does not require law enforcement to conduct an exhaustive investigation once probable cause is established. *See, e.g.*, *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000) (explaining that law enforcement "was not required to undertake an exhaustive investigation in order to

validate the probable cause that . . . already existed").  "[O]nce a law enforcement official has sufficient evidence within his knowledge to establish probable cause, no further investigation is required."  *Dintino v. Echols*, 243 F. Supp. 2d 255, 264 (E.D. Pa. 2003).  Indeed, even when there is "evidence that might exonerate a defendant [that] does not defeat probable cause."  *Davis v. Malitzki*, 451 F. App'x 228, 233 (3d Cir. 2011).  For these reasons, an alleged "failure to investigate fully is not evidence of an affiant's reckless disregard for truth."  *United States v. Brown*, 631 F.3d 638, 648 (3d Cir. 2011) (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993)).

Third, Defendants correctly point out that the evidence Starks wishes law enforcement uncovered would simply support his affirmative defense that he acted in self-defense.  (Doc. 47, p. 6.)  In essence, Starks is alleging that if Defendants conducted an exhaustive investigation, they would have realized that Starks shot at Knight in self-defense.  Yet, "[p]olice officers are generally not required to consider an affirmative defense that is not 'a clear cut matter in criminal prosecutions.'"  *Rittacco v. Zelechowski*, Civil Action No. 22-544, 2024 WL 2319505, at *9 (W.D. Pa. May 22, 2024).  The inherently fact-intensive nature of self-defense is not a straightforward matter "fit for resolution by the charging officer" in a case like this one.  *Id.* (collecting authority).  For these three reasons, Plaintiffs have not identified any omissions that are relevant to the instant analysis.

The only non-conclusory allegation that arguably identifies a specific

omission in the amended complaint states:

> "[T]he body worn camera of Sgt. Asper shows that NYCRPD was
> aware that [Starks's vehicle] was disabled at the time he was violently
> rammed by a vehicle with over 13g's of force, and that shots were fired
> after [Knight's vehicle] crashed into [Starks's vehicle] two (2) to three
> (3) times."

(Doc. 25, ¶ 31.)  Starks emphasizes the importance of this allegation in his brief in

opposition.  (Doc. 41, p. 8.)  Yet, the Lebo Affidavit plainly includes this

information.  It clearly describes Starks's statement to law enforcement that his

vehicle went into "limp mode"—allowing him to drive only "2–5 MPH"— after

Knight purportedly made "small contact to the rear of [Starks's] vehicle."  (Doc.

34-1, p. 3.)  Similarly, the Lebo Affidavit includes both Starks's statements that he

only fired at Knight after Knight had thrice violently rammed Starks's vehicle.

(*Id.*)  Clearly, Defendants could not have intentionally or recklessly omitted

information when the information is actually included in the Lebo Affidavit.

Therefore, Starks has failed to adequately allege any omissions that are relevant to

this analysis.

Next, the court considers alleged false statements in the Lebo Affidavit.

Starks primarily contends that Defendants' failure to fully investigate the incident

caused them to include many false statements in the Lebo Affidavit.[5]  However, the court observes that such statements could not have been made with the requisite intent for the reasons similar omission could not have been.

Excluding conclusory allegations of falsity, the amended complaint identifies two specific statements that Starks claims were false.  First, Starks claims that Asper falsely spread information that Knight was shot by a shotgun, even though Knight told Asper that he was not and no other evidence supported Asper's conclusion.  (Doc. 25, ¶¶ 105, 113, 116.)  Second, Starks claims that Diehl's statement that she heard gunshots only after the vehicles collided was false, because she later changed her testimony at trial.  (Doc. 25, ¶ 296.)  Even assuming Defendants had the requisite intent in making these allegedly false statements, they are immaterial to the conclusion that probable cause existed.

### ii.  Reconstructing the Lebo Affidavit

At the next step, the court considers the materiality of the identified improper omissions and false statements.  Having determined that Starks failed to identify *any* omission made with the requisite intent, the court need only consider whether there was probable cause after excising the two allegedly false statements from the Lebo Affidavit.  There undoubtedly was.

---

[5] Paragraph 31 of the amended complaint is illustrative.  It reads, "Officer Lebo, and NYCRPD all knowingly provided false information to the Prosecutor in that they stated that the evidence supported the statements of Ken Knight where the evidence was not reviewed or analyzed." (Doc. 25, ¶ 31.)

First, there is no mention in the Lebo Affidavit that Knight was shot by a shotgun. The Lebo Affidavit merely makes several passing references to the shotgun Starks possessed. (Doc. 34-1, pp. 1–4.) Even if Asper falsely stated that Knight was shot with a shotgun, those statements were not included in the Lebo Affidavit and, thus, were unnecessary to finding probable cause. Therefore, there is nothing for the court to excise from the Lebo Affidavit.

Second, the court will address Diehl's statements in the Lebo Affidavit suggesting that Knight was the aggressor, not Starks. By definition, such *exculpatory* evidence cannot be the basis for establishing probable cause. Therefore, excising Diehl's allegedly false statements from the Lebo Affidavit would do nothing to undermine the finding of probable cause.

The court finds that the "reconstructed" Lebo Affidavit is substantively identical to the original for the purposes of determining probable cause. The court did not insert or excise any information that undermines a finding of probable cause. As written, the Lebo Affidavit includes statements from Knight that incriminate Starks. It also includes an analysis of objective surveillance footage time-matched to audio of Starks's 911 call, which corroborates Knight's statements to police. The Lebo Affidavit contains more than "a credible report from a credible witness," which itself is sufficient to establish probable cause. *Merkle*,

211 F.3d at 790.  Thus, the Lebo Affidavit clearly establishes a reasonable belief that Starks committed a crime.

This independent conclusion is further supported by the finding of probable cause at Starks's preliminary hearing.  *Bingaman v. Buhay*, No. 4:06-CV-2144, 2007 WL 707026, at *5 (M.D. Pa. Mar. 2, 2007) (explaining that a "finding of probable cause at a preliminary hearing," although not conclusive, "may be evidence of probable cause"); *see also Pardue v. Gray*, 136 F. App'x 529, 533 (3d Cir. 2005) (approving of district court citing independent findings of probable cause "as evidence that supported, rather than compelled, a finding of probable cause").  Starks dismisses the significance of the preliminary hearing.  He argues—without citing authority—that the purpose of a preliminary hearing is to determine if there is *prima facie* case against the defendant, not to determine if there is probable cause.  (Doc. 41, p. 6.)  This is simply a semantic difference without a distinction.  As the Pennsylvania Supreme Court has recognized, "'a prima facie case' entails a mere determination of probable cause."  *Commonwealth v. Williams*, No. 17 EAP 2024, 2025 WL 542355, at *6 (Pa. Feb. 19, 2025) (quoting *Commonwealth v. Talley*, 265 A.3d 485, 517 (Pa. 2021)); *accord Commonwealth v. Grekis*, 601 A.2d 1284, 1292 n.10 (Pa. Super. Ct. 1992) ("The purpose of a preliminary hearing is to establish that there is probable cause to hold a defendant for trial and to protect an accused against unlawful detention.").

Finally, Starks is adamant that the prosecutors' decision to withdraw with prejudice the charges against him proves, *ex post facto*, that probable cause clearly didn't exist. (*See, e.g.*, Doc. 25, ¶ 33; Doc. 41, p. 5.) The court disagrees that the prosecutors' decision is significant on this issue. Simply obtaining a favorable outcome at trial does not, *per se*, negate an earlier finding of probable cause. *See Zimmerman v. Corbett*, 873 F.3d 414, 419 (3d Cir. 2017). That is especially true where, as here, the withdrawal of the charges resulted from a change in a witness's testimony from the start of the investigation to the trial.

The court determines that Starks has not alleged a constitutional violation, because Defendants had probable cause to arrest and charge him. Accordingly, qualified immunity shields Lebo and Asper from the Fourth Amendment claims. The court will, therefore, dismiss these claims with prejudice.

To the extent that Starks's *Monell* claims against NYCRPD and Heidelberg are based on these Fourth Amendment claims, they too must fail. *See Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no [constitutional] violation in the first place, there can be no derivative municipal claim.")

So, too, Starks's state-law claim for malicious prosecution must fail. *See Tomaskevitch v. Specialty Records Corp.*, 717 A.2d 30, 33 (Pa. Commw. Ct. 1998)

(stating that "[a]bsense of probable cause is an indispensable element of" a malicious-prosecution claim under Pennsylvania law).

## 2. Fourteenth Amendment Claims

Starks and Christian both assert § 1983 claims for alleged violations of their rights under the Equal Protection Clause. Plaintiffs' amended complaint requires a close reading to parse out exactly what the claim is. Plaintiffs' five-line response in opposition to Defendants' motion to dismiss these claims did not provide any additional clarity. Based on a comprehensive review of the amended complaint, the court interprets Christian's claim to be a general § 1983 equal protection claim and Starks's claim to be a selective-enforcement claim. Defendants do not make any argument that qualified immunity shields them from these claims; instead, they move to dismiss these claims pursuant to Rule 12(b)(6). (*See* Doc. 35, pp. 33–35.) The court analyzes each plaintiff's respective claim in turn.

### i. Christian's equal protection claim

Christian brings an equal protection claim against Migatulski, NYCRPD, and Heidelberg. The thrust of Christian's claim appears to be that Migatulski allegedly failed to respond promptly to Starks's 911 call because Christian was a member of a protected class. (*See* Doc. 25, ¶¶ 202–206.) To survive Defendants' motion to dismiss, Christian "must allege that he was: (1) a member of a protected class; (2) similarly situated to members of an unprotected class; and (3) treated

differently from members of the unprotected class." *Green v. Chester Upland Sch. Dist.*, 89 F. Supp. 3d 682, 693 (E.D. Pa. 2015). The sine qua non of an equal protection claim is "purposeful discrimination" *Id.*

Upon review of the amended complaint, Christian fails to allege any facts to suggest that Migatulski treated him less favorably than a similarly situated person. This is fatal to his claim. *See id.* (dismissing equal protection claim when plaintiff failed to identify a similarly situated individual who received different treatment). Nothing in the amended complaint suggests that Migatulski knew that Christian was the person for whom Starks requested police assistance. There is no allegation that Christian made any of the 911 calls himself or that Migatulski spoke with Christian before responding to Starks's 911 calls or had any knowledge of Christian. Thus, it is implausible that Migatulski's allegedly delinquent response could have been the product of purposeful discrimination against Christian. Therefore, Christian's equal protection claim fails.

### ii. Starks's equal protection claim

Starks claims that Defendants targeted him for criminal prosecution, rather than Knight, on the basis of Starks's race. Although not labelled as such, Starks's equal protection claim is a claim for selective enforcement. Discriminatory enforcement of race-neutral laws "has been held to violate the Equal Protection Clause of the Fourteenth Amendment since *Yick Wo v. Hopkins*." *Davis*, 451 F.

App'x at 234. "[S]elective prosecution [or enforcement] may constitute illegal discrimination even if the prosecution [or enforcement] is otherwise warranted." [6] *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 425 (3d Cir. 2003). Accordingly, the court's ruling on Starks's Fourth Amendment claims is immaterial to his Equal Protection claims. *See Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) (finding that the absence of a Fourth Amendment violation does not bar an Equal Protection claim).

To survive Defendants' motion to dismiss, Starks's allegations "must demonstrate (1) that he was treated differently from other similarly situated individuals, and (2) that this selective treatment was based on an unjustifiable standard, such as race, religion, or some other arbitrary factor." *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (internal quotation marks omitted) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)).

With respect to the first element, a similarly situated individual in this context is one who "committed the same basic crime in substantially the same manner." *United States v. Houck*, No. 22-CR-323, 2023 WL 144117, at *2 (E.D. Pa. Jan. 10, 2023) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)). Here, Starks alleges that an unprovoked Knight intentionally caused

---

[6] A "selective enforcement" claim has virtually identical standards as a "selective prosecution" claim; the former is pleaded "when a plaintiff's grievance is directed solely at police misconduct," rather than prosecutorial misconduct. *Davis*, 451 F. App'x at 234 n.11.

multiple violent collisions between his vehicle and Starks's while Starks was in or next to his vehicle. (Doc. 25, ¶¶ 74–86.) If true, these actions could plausibly support a finding that Knight committed the same crimes with which Starks was charged. Accordingly, Starks has sufficiently alleged that Knight is a similarly situated individual and that he received different treatment than Knight.

With respect to the second element, Starks generally alleges that Defendants in their investigation were "motivated by prejudicial, discriminatory, and non-relevant factors necessarily including his race." (Doc. 25, ¶ 91.) He supports this general allegation with more specific allegations that Defendants used racially charged language when referring to Starks and Christian. As noted above, Starks alleges that Asper referred to him as "foreign" and to Christian as the "Chinese guy, Korean guy, or whatever." (*Id.* ¶ 101.) Asper allegedly also made statements intimating that Starks was a drug user and "suggested to other officers during the investigation that . . . Starks and/or his family are likely drug dealers." (*Id.* ¶ 103.) Starks alleges that Asper's statements reveal that "Asper made a rush to judgment, based in racial discrimination, without examining the evidence." (*Id.* ¶ 116.) He also alleges that Asper's statements tainted Defendants' investigation. (*Id.*) Taken together, the court finds that these allegations sufficiently support Starks's claim that he suffered from selective treatment based on race. *Cf. Watson v. Witmer*, 183 F. Supp. 3d 607, 613 (M.D. Pa. 2016) (finding plaintiff's equal protection claim

survived motion to dismiss).  Therefore, the court will not dismiss Starks's equal protection claims.

### iii. Starks's *Monell* Claims against NYCRPD

Starks also brings *Monell* claims against NYCRPD for the alleged violation of his equal protection rights.  (Doc. 25, ¶¶ 207–36.)[7]  Defendants insist that these claims should also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Municipalities cannot be held "vicariously liable under § 1983 for their employees' actions."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011).  Instead, municipalities only become liable under § 1983 "when execution of a government's policy or custom" causes the constitutional injury.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  For his *Monell* claims to survive, Starks must plead that a "policy or custom, whether made by it lawmakers or by those whose edicts or acts may fairly be said to represent official policy inflict[ed] [his] injury."  *Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 400 (E.D. Pa. 2016) (quoting *Monell*, 436 U.S. at 694).

---

[7] Starks also brings a *Monell* claim against Heidelberg.  (Doc. 25, ¶¶ 242–46.)  The court interprets this as an alternatively pleaded claim that would be operative "to the extent that NYCRPD is a sub-unit and/or agency or part of" Heidelberg.  (*Id.* ¶ 245.)  It seems that Starks brought the *Monell* claim against Heidelberg in case NYCRPD was not the proper entity to sue.  The parties are directed to confer as to whether Heidelberg is a necessary defendant in this case and, if not, file a stipulation of dismissal.

NYCRPD mostly faults Starks for failing to identify any specific policy or custom that caused Starks's alleged injuries.  (Doc. 35, p. 31.)  Although it is true that Starks failed to identify a specific policy or custom, a plaintiff is not required to meet such an "unduly harsh" burden at the pleading stage.  *Carter v. City of Philadelphia*, 181 F.3d 339, 357–58 (3d Cir. 1999).  Indeed, there are multiple ways a plaintiff can plead that a policy or custom caused their constitutional injury without specifically identifying a formal policy.  *Ashley v. Kosehba*, No. 1:22-CV-00982, 2023 WL 6200805, at *4 (M.D. Pa. Sept. 22, 2023).  It is clear, however, that Starks's allegations entirely rely on only one such way: NYCRPD's failure to train its officers.

The Supreme Court long ago recognized that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  From *Canton*, the Third Circuit has adopted a three-part test to determine when "a municipality's failure to train or supervise . . . amount[s] to  deliberate indifference."  *Carter*, 181 F.3d at 357 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).  Under the *Carter* test, Starks must allege that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees

mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (footnote omitted).

As to the first factor, the policymaker must "'know to a moral certainty' that their officials will face a certain situation." *Jones v. County of York*, No. 1:19-CV-00229, 2020 WL 3892878, at *5 (M.D. Pa. July 10, 2020) (quoting *Carter*, 181 F.3d at 357). Here, Starks alleges that NYCRPD knew that their officers will "need to determine fault and/or criminal conduct, and/or . . . need to remain neutral and non-discriminatory regarding race/color/national origin of participants/ witnesses." (Doc. 25, ¶ 222.) In essence, Starks is alleging that NYCRPD knew that officers will need to investigate potential criminal conduct and will have to do so in a non-discriminatory manner. This is a sufficient allegation to satisfy this first factor.

With respect to the second factor, Starks relies on two specific allegations of past misconduct against NYCRPD. First, he alleges that NYCRPD was previously sued for constitutional violations in *Snyder v. Wallace*, No. 1:15-cv-00760 (M.D. Pa. filed Apr. 17, 2015). (*Id.* ¶ 228.) This case, however, could not have provided NYCRPD notice that its employees were engaging in racial discrimination for two reasons. *Snyder* has nothing to do with discriminatory conduct or Equal Protection violations. *See* Compl., *Snyder v. Williams*, No. 1:15-cv-00760 (M.D. Pa. Apr. 17, 2015), ECF No. 1. And, no finding of actual wrongdoing was ever made, because

the case was settled.  Stipulation of Dismissal, *Snyder v. Wallace,* No. 1:15-cv-00760 (M.D. Pa. Apr. 13, 2026), ECF No. 37; *see Jones,* 2020 WL 3892878, at *5 (explaining that settled "cases fail to prove that the [defendant] was on notice of wrongdoing by its employees").  Nevertheless, Starks's also alleges that NYCRPD's annual reports from 2017 through 2021 reveal that its officers had been disciplined for violations 42 times during that period.  (Doc. 25, ¶ 219.)  Starks does not specifically allege that any of those violations concerned racial discrimination.  Yet, specific descriptions of the incidents involved are presumably not included in the annual reports or otherwise available to Starks.  Given this, Starks should be permitted to proceed to discovery to test his claims.

Finally, as to the third factor, Starks alleges that if NYCRPD officers continued to racially discriminate "in performing a police investigation, that will frequently cause the deprivation of constitutional rights."  (*Id.* ¶ 233.)  NYCRPD makes no argument as to why that allegation is insufficient under the *Carter* test.  The court see no reason why it would be.  Accordingly, Starks's pleadings satisfy the three *Carter* factors.  Starks's *Monell* claims against NYCRPD will proceed as it relates to the alleged Equal Protection violation.

### 3. Conspiracy Claims

Starks and Christian also bring a § 1983 conspiracy claim against Lebo, Asper, Migatulski, and NYCRPD. For this claim to survive a motion to dismiss, Plaintiffs must allege:

> "(1) two or more persons conspire[d] to deprive any person of [constitutional rights];
>
> (2) one or more of the conspirators perform[ed] . . . any overt act in furtherance of the conspiracy; and
>
> (3) that overt act injure[d] the plaintiff[s] in his person or property or deprive[d] the plaintiff[s] of any right or privilege of a citizen of the United States . . . with the added gloss under § 1983 that "the conspirators act 'under the color of state law.'"

*Jutrowski v. Township of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (quoting *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)). Defendants argue that Plaintiffs merely proffer "boilerplate" allegations of conspiracy. (Doc. 35, p. 39.) The court agrees. Plaintiffs allege that Defendants conspired to violate Plaintiffs' constitutional rights without alleging any facts to suggest, let alone support, that Defendants agreed to violate Plaintiffs' rights. This is insufficient to state a § 1983 conspiracy claim. *Leer Elec., Inc. v. Pa. Dep't of Lab. & Indus.*, 597 F. Supp. 2d 470, 484 (M.D. Pa. 2009). Thus, the court will dismiss Plaintiffs' § 1983 conspiracy claim.

As to Starks's civil conspiracy claims under Pennsylvania law, Starks's failure to proffer allegations beyond a recitation of the cause of action's elements

also necessitates the dismissal of those state law claims. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979) ("To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."); *Shaffer v. Proctor & Gamble*, 604 A.2d 289, 293 (Pa. Super. Ct. 1992) (affirming dismissal of civil conspiracy claim when it was "merely conclusory rather than presenting facts").

### 4. Remaining Assortment of other Alleged Constitutional Violations

Finally, the court must parse the remaining constitutional claims from the following allegation, which Starks lodges against Lebo and Asper:

> [Officer Lebo/Sgt. Asper] while acting under color of state law deprived Richard Starks of his rights under the Constitution and law of the United States, in violation of 42 U.S.C. Section 1983, including violating his 4th amendment rights including to be free from searches and seizures, violating the duty to disclose or act upon exculpatory evidence, failing to conduct a constitutionally adequate and independent investigation of the facts and the evidence, violating the duty to gather, test, and preserve evidence, violating the rights of accused in criminal proceedings, rights under Brady v. Maryland, and rights to Due Process under the law, violating the right to bear arms and the right to travel, and in otherwise violating [sic] of his Civil Rights under both the US Constitution and the Pa. Constitution including the right against false arrest and malicious prosecution where Richard Starks was actually innocent of the charges lodged against him.

(Doc. 25, ¶¶ 186, 193.) Considering these paragraphs together with the parties briefing, the court identifies four additional § 1983 claims arising respectively

from: (1) alleged *Brady* violations; (2) alleged violations of Starks's due process rights; (3) alleged violations of Starks's Second Amendment rights; and (4) alleged violations of Starks's right to travel.  (*See id.*)  None of these claims pass muster.

As to the first two, Defendants interpret Starks's due process claim to be entirely premised on the alleged *Brady* violations.  (Doc. 35, p. 30 n.6.)  Starks does not dispute this interpretation.  Defendants argue that both claims should fail, because none of them were alleged to have played a role in the alleged *Brady* violations.  (*Id.*)  The Third Circuit has recognized a § 1983 claim can be brought against police officers who "affirmatively conceal material evidence from the prosecutor."  *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010).  As explained above, however, Starks makes no allegation that Lebo or Asper affirmatively withheld information from prosecutors.  Accordingly, Starks's due process and *Brady* claims fail.[8]

Defendants also argue that the court should dismiss Starks's Second Amendment claims for being "completely underdeveloped."  (Doc. 35, p. 30 n.6.) The court agrees.  Besides a single conclusory reference to a Second Amendment

---

[8] One could interpret Starks's due process claim as being premised on law enforcement's allegedly deficient investigation.  Such a claim, however, "if cognizable, could only arise under the Fourth Amendment."  *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018) (citing *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)).  Therefore, Starks cannot save his faulty Fourth Amendment claim by framing it as a due process claim.

violation, no factual allegations in the amended complaint indicate that a Second Amendment violation occurred. Therefore, Starks's Second Amendment claim also fails.

Defendants did not ask the court to dismiss Starks's claim for violations of his right to travel. Nevertheless, there is little doubt that Starks's perfunctory, four-word reference to a such violation is insufficient to state a claim. The court will, therefore, dismiss this claim *sua sponte*. *See Bintliff-Ritchie v. Am. Reinsurance Co.*, 285 F. App'x 940, 943 (3d Cir. 2008) ("The District Court has the power to dismiss claims *sua sponte* under Rule 12(b)(6).")

## C. State Law Claims

Defendants also seek dismissal of Plaintiffs' Pennsylvania tort claims. Starks and Christian each bring claims against Defendants for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). The court agrees that Plaintiffs have failed to state claims for IIED and NIED.

### 1. IIED

To state a claim for IIED under Pennsylvania law, Plaintiffs must plead: "(1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that the same was 'substantially certain' to occur."

*Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 439 (M.D. Pa. 2018) (citing

*Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217–18 (3rd Cir. 2001)).

Defendants' argument for dismissal assumes that Plaintiffs' IIED claims are premised on their discontent with Defendants' investigation. (Doc. 35, pp. 35–36.) Plaintiffs do not refute Defendants' assumption, but rather provide a cursory response that refers the court back to its pleading. (Doc. 41, p. 14.) Upon close review of the amended complaint, the court interprets Plaintiffs' IIED claims differently than Defendants. Christian's IIED claim arises from the racially inflammatory language that Defendants' allegedly directed towards him. Similarly, Starks's claim arises from his witnessing of the IIED Defendants allegedly inflicted upon his son. *See generally* Restatement (Second) of Torts § 46(2) (describing liability when IIED is directed at a third person). Nevertheless, these IIED claims still must fail, because Defendants' alleged actions are not outrageous or extreme as a matter of law.

"It is well established that only the most extreme and outrageous conduct will give rise to an IIED claim." *Amspacher v. Red Lion Area Sch. Dist.*, No. 1:23-CV-00286, 2024 WL 4631815, at *6 (M.D. Pa. Oct. 30, 2024); *accord Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (explaining that IIED claims arise from "only the most clearly desperate and ultra extreme conduct"). "'[M]ere insults, indignities, threats, annoyances, petty oppressions, and other trivialities' do not

constitute extreme and outrageous conduct." *Amspacher*, 2024 WL 4631815, at *6 (quoting *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 543 (M.D. Pa. 2009)).  A defendant exhibiting "callousness or insensitivity . . . does not suffice to establish liability" for IIED.  *Waite v. Blair, Inc.*, 937 F. Supp. 460, 474 (W.D. Pa. 1995).

Here, Defendants allegedly referred to Christian as "this Chinese guy, or Korean guy, or whatever" and referred to Starks as "foreigner."  (Doc. 25, ¶¶ 269–70.)  This isolated conduct alone is not so outrageous and extreme as to give rise to IIED liability.  *Cf. Johnson v. Lowes Cos.*, Civil Action No. 05-6018, 2007 WL 792332, at *3 (E.D. Pa. Mar. 14, 2007) (holding that the defendant's reference to the plaintiff as "Black Lady" was "not extreme and outrageous behavior sufficient to establish liability for [IIED]"); *Dawson v. Zayre Dep't Stores*, 499 A.2d 648, 649 (Pa. Super. Ct. 1985) (determining that the defendant's use of a racial epithet directed at plaintiff, although "derogatory and offensive," was not sufficiently extreme to permit recovery for IIED "without other aggravating circumstances").  Having failed to allege sufficiently outrageous and extreme conduct, Plaintiffs' IIED claims must fail.

## 2.  Negligent Infliction of Emotional Distress

Defendants claim that they are all immune from liability for Plaintiffs' NIED claims under Pennsylvania statutory law.  The court agrees.  In Pennsylvania, a

"local agency" is immune from liability "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Con. Stat. § 8541. There are several limited exceptions to this general rule that are not applicable here. *See* 42 Pa. Con. Stat. § 8542(b). Similarly, employees of local agencies possess immunity from liability for civil damages "caused by acts of the employee which are within the scope of his office or duties" that is commensurate with "his employing local agency." 42 Pa. Con. Stat. § 8545.[9] Defendants plainly fall within the ambit of these provisions.

Plaintiffs offer a single retort. They claim—without citation to any authority—that NYCRPD is not a "local agency." (Doc. 41, pp. 14–15.) They posit that NYCRPD is not a local agency since "it is run by a Board of Directors, and provides services to multiple (eleven) townships or municipalities." (Doc. 41, p. 15.) This argument is wholly unpersuasive. "Local agency" is defined by statute as "[a] government unit other than the Commonwealth government." 42 Pa. Con. Stat. § 8501. NYCRPD squarely fits this definition. *See Galligani v. N. York. Cty. Reg'l Police Dep't*, No. 1:10-CV-1136, 2012 WL 5386131, at *1 (M.D. Pa. Nov. 1, 2012) (describing NYCRPD as a "state government agency").

---

[9] Employees of local agencies, however, are not immune for actions deemed to be "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Con. Stat. § 8550. Plaintiffs do not allege that Defendants' actions giving rise to the NIED claim fall within any of these categories.

Therefore, Plaintiffs NIED claims must be dismissed with prejudice, because Defendants are immune from them.

### D. Dismissal with Prejudice

In addition to the claims from which Defendants are immune, the court will dismiss with prejudice Plaintiffs' other deficient claims. Starks and Christian "had the opportunity to amend" their claims "and cure [the] deficiencies" that Defendants identified in their original motion to dismiss. *Prukala v. Chase Bank, N.A.*, No. 3:19-CV-1791, 2020 WL 5351042, at *5 (M.D. Pa. Sept. 4, 2020). They failed to do so. This failure warrants dismissal with prejudice. *Ghaffari v. Wells Fargo Bank NA*, 621 F. App'x 121, 125 (3d Cir. 2015).

CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part Defendants' motion to dismiss. The court will deny Defendants' motion with respect to Starks's Fourteenth Amendment claim. The court will grant Defendants' motion with respect to all other claims against Defendants. An appropriate order will issue.

s/Jennifer P. Wilson<br>JENNIFER P. WILSON<br>United States District Judge<br>Middle District of Pennsylvania

Dated: March 24, 2025